UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILL LEHMAN,

                Plaintiff,                          Case Number 22-12790

v.                                                              Honorable David M. Lawson

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA, and NEIL M. BAROFSKY,

                Defendants.
_____/

## OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND DISMISSING COMPLAINT WITH PREJUDICE

Plaintiff Will Lehman has filed a complaint against the defendant International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW) and court-appointed election monitor Neil Barofsky alleging defects in the notice and ballot distribution procedures put in place for the ongoing election for choosing international union officers. Lehman alleges that the procedures used are inadequate to notify the UAW membership that the election is taking place, ballots have not been distributed properly, and much of the membership has not had proper access to the ballots. He brings his claim ostensibly under Title I of the Labor-Management Reporting and Disclosure Act (LMRDA), asking that the Court intervene in the election process by extending by 30 days the deadlines for requesting and receiving ballots in the ongoing direct election of UAW officers, and requiring the Union to make additional efforts to provide "effective notice" about the election and the members' right to vote. He also filed a motion for a preliminary injunction asking for the same relief. The Court ordered responses from the defendants and from the Department of Labor through the local United States Attorney's office and held a hearing on the motion on November 22, 2022.

It is apparent from the pleadings, briefs, and parties' arguments that the plaintiff's claim actually implicates Title IV of the LMRDA, not Title I. The Court does not have subject matter jurisdiction to adjudicate a claim under Title IV; claims under that statute must be presented in the first instance to the Secretary of Labor. And Lehman has no standing to assert a claim under Title I because he has not suffered a personal harm that can be redressed under the authority of that statute. The motion for preliminary injunction will be denied, and the case will be dismissed for want of subject matter jurisdiction.

I.

For the first time in its history, the UAW is choosing its officers and members of the International Executive Board (IEB) through direct election by its members, instead of selecting them at a convention of union delegates. The parties are well familiar with how that change came about.

On January 29, 2021, the Court entered a consent decree in the matter of *United States v. UAW*, Case No. 20-13293 (E.D. Mich.), which arose from a civil enforcement action brought by the United States against defendant UAW. The consent decree provided for the appointment by the Court of a Monitor charged with, among other things, "ensur[ing] that the election of the members of the [International Executive Board (IEB)] of the UAW shall follow the requirements of the UAW Constitution, and all applicable state and federal laws, and this decree." Consent Decree ¶ 45, ECF No. 10, PageID.126. On May 12, 2021, the Court granted the government's unopposed motion to appoint Neil M. Barofsky as the Monitor.

Among other substantive provisions, the consent decree required the UAW to hold a member referendum on the question whether to change the method of electing members of the IEB to a "one-member, one-vote" direct election process, rather than election at a convention of


delegates, as IEB elections historically had been conducted. The initiative to change the election method passed by a margin of 63% to 37%, and the Court issued an order approving the results of the referendum on January 31, 2022.

During the 38th Constitutional Convention held by the UAW in July 2022, the Union's charter was amended to implement the referendum by changing the election method. The Union was to undertake the first election of IEB members by the new method during October and November 2022, and that process is ongoing at the present time. According to an "informal notice of election" published by the Monitor, all UAW members in good standing as of October 31, 2022 are eligible to vote, ballots would be (and were) sent by mail to UAW members in two waves on October 17 and 24, 2022, and ballots sent in by mail must be received no later than November 28, 2022 in order to be counted. *See* Informal Notice of 2022 Direct Election of International Officers, https://tinyurl.com/y352ur2z. According to its own website, the UAW is one of "one of the largest and most diverse unions in North America." *See* UAW: Who We Are, https://uaw.org/about. It is comprised of "more than 600 local unions" that have "more than 400,000 active members and more than 580,000 retired members in the United States, Canada and Puerto Rico." *Ibid.*

On November 17, 2022, UAW member William Lehman filed his complaint in this matter, which named the UAW and the court-appointed Monitor as defendants. In his complaint, Lehman alleges that the Union failed to provide effective notice of the election to it members, mainly due to numerous shortfalls in its methods of maintaining membership lists and distributing correspondence to members, and that as a result the union's members largely are unaware of the election or their right to vote. Lehman pleaded claims citing Title I of the LMRDA, which sets forth a "Bill of Rights" for union members, including guarantees of their rights to vote and to have an "equal say" in elections of union officers. 29 U.S.C. § 411.

Lehman alleges that because the Union failed to provide "effective notice" to all its members about the timeline of the election and failed in other ways to provide timely ballot access, the Union has frustrated the rights of members to cast their votes and to have their say in the election of IEB officials. He does not allege that he did not receive a ballot himself or was unable to vote in the election. As it turns out, he is himself a candidate for the office of union president.

Shortly after the complaint was filed, Lehman filed the motion for a preliminary injunction and a temporary restraining order (TRO) discussed above. The motion is supported by affidavits of four union members including Lehman, two of whom attested that they requested ballots but have not received them yet. The affiants also assert that among their co-workers, "no one seems to know about the election," and one attested that there were "no notices about the election" posted at her work site. The motion also included lengthy excerpts of the Monitor's report of the 2021 member referendum results, which noted, among other things, that only approximately 140,000 votes were cast in the referendum (allegedly approximately 13% of the entire UAW membership eligible to vote). Lehman points out that, according to a running tally maintained by the Monitor on the internet, only slightly more than 94,000 ballots had been returned as of November 16, 2022, reflecting a similarly remarkably low turnout. *See* Ballot Information: Received Ballot Count, https://uawvote.com/.

The Court denied the plaintiff's request for a TRO, scheduled a hearing on the motion for a preliminary injunction, set an expedited briefing schedule for the motion, and also entered an order in the matter of *United States v. UAW*, No 20-13293 (E.D. Mich.), directing the government to enter an appearance in the *Lehman* case and either file a brief as *amicus curiae* addressing certain issues, or a motion for leave to intervene if it desired to intervene in the matter in a capacity other

than as *amicus*. The government has elected not to intervene, but it has filed an *amicus* brief in opposition to the motion. The UAW and the Monitor also have responded.

The focus of the complaint and the motion is the procedure used by the Union to give notice of the election and to distribute ballots. Notably, William Lehman is the only individual plaintiff in the case, and none of the other named and unnamed persons alluded to throughout the pleadings and in materials submitted with the motion have joined as plaintiffs. The motion is supported by four affidavits by Lehman and three other union members.

- Halle Minor, a UAW member, attested that she requested a ballot but has not received one. She also said that in her workplace "noone on the shop floor seems to know that an election is going on."

- Lesley Johnson, a UAW member, attested that she requested a ballot on October 28, but has not received one. She also says that there are no notices at her workplace about the election, and "the UAW was not telling anyone they could vote."

- Jacquelyn Cargile attested that it "took me far too long to finally get my ballot," and that she had to "go out of her way to bug her union rep" about getting one.

- William Lehman, who is the lone individual plaintiff in the case, conspicuously does not attest that he did not receive a ballot or was unable to cast a ballot in the election. The bulk of his affidavit consists of hearsay reports from other union members relating to difficulties obtaining ballots or lack of notice about the election. He says that some of the complainants did not want to be identified for fear of "retribution" from the Union.

The motion also is supported by excerpts of the Monitor's referendum report, highlighting the Monitor's conclusions that the UAW violated the rules of the referendum in several instances, e.g., by using union funds to promote a campaign against the one-member, one-vote principle, and that the turnout for the referendum was remarkably low among the entire union membership eligible to vote (around 13% of the eligible membership).

In its response, the UAW provides a fulsome description of the procedures it put in place to run the election. It explains that, with the Monitor's approval, it retained Merriman River Group and Election Systems & Software (MRG) as vendor to handle ballot distribution and tallying in

the ongoing direct election of IEB officers. The UAW published articles on its website identifying candidates and providing information about the upcoming election in May, August, and September 2022. The Union also made "numerous" posts about the election on its official Facebook page, which has approximately 138,000 followers. In October 2022, the Union also designed, printed, and mailed 2,975 posters about the election, which were mailed to locals around the country, along with PDF copies of the same for reproduction. Prior to the election cycle, the Union's Secretary-Treasurer published two regular newsletters distributed to the financial secretaries of all local unions urging them to update member information in the Union's Local Union Information System (LUIS) database, which is used to maintain a global mailing list for correspondence with all union members. In July 2022, the Union also sent a letter to all local union officers reminding them of their obligations to maintain current information about their membership in LUIS. Throughout the election process, the Union's Secretary-Treasurer, the Monitor, and the election vendor have held weekly phone calls to discuss issues relating to ballot distribution and returns.

Matthew Fitch, the executive director of MRG, the election vendor, states that the UAW sent the ballot mailing list to Rees Associates, the mailing house, which checked the addresses against the United States Post Office's change-of-address database. If changes were detected, ballots — approximately 11,000 of them — were mailed to both addresses (with the Monitor's approval). Rees began mailing over one million ballots during the week of October 17, 2022. Rees mailed additional ballots in scheduled supplemental distributions.

The Monitor states that, as noted in his initial report, he found at the outset of the monitorship that the Union's LUIS database was somewhat lacking because union locals were not regularly updating member information in the system. The Monitor undertook work with the UAW to improve the quality of the membership data, including "(1) coordinating direct outreach

to members encouraging them to update their mailing addresses with their Local Unions; (2) assisting Local Unions with updating their member records in [LUIS]; and (3) overseeing testing and improvements to the Global Mailing List by working directly with the Election Vendor." Glen G. McGorty decl. ¶ 8, ECF No. 19, PageID.761. In addition, "[t]he Monitor and the UAW have engaged in a months-long communication campaign to notify members regarding the election in general, [to encourage members] to update their mailing addresses[,] and to encourage Local Union leaders to input that information into LUIS." *Id.* ¶ 9. Those efforts included an email initiative to the union local offices to update the LUIS member data by direct outreach, posting notices in the workplace and union offices, and utilizing social media; informational postings on the LUIS system itself; and publishing relevant links on the Monitor's and Union's websites. *Ibid.* The Monitor also sent his representatives to meet with local representatives to ask for help updating members' records. *Ibid.*

The ballots sent out to members included a "notice of election" that states, among other things, that ballots must be received by November 28, 2022 in order to be counted. The notice also suggests to members that ballots be mailed by November 18, 2022 to ensure timely delivery, but the election rules do not impose any cutoff date for ballots to be postmarked. The Monitor published several notices of the election including (1) the official rules for the election, which were posted on the Monitor's website for months in advance of the election, (2) a two-page "informal notice" of the election containing all relevant election deadlines and ballot request and return instructions, *see* Informal Notice of 2022 Direct Election of International Officers, https://tinyurl.com/y352ur2z, which was posted on both the Monitor's and the UAW's websites, and also included in the September 2022 edition of the Union's member newsletter ("Solidarity"), which was distributed online, via email, and by postal mail, (3) directives from the UAW to all

local unions to post the informal notice in workplaces and convey it to members via email, and (4) three "candidate forums" hosted by the Monitor in September 2022, to provide election information and introduce candidates to all interested members. The candidate forums were streamed line online and posted on YouTube, where they have received approximately 38,000 views. Prior to the streams, the Monitor also sent emails to all union members with email addresses on record informing them about the election and the upcoming forums.

The Monitor also has maintained an Election Hotline, reachable by phone or email, which has been open continuously since the 2021 member referendum. Between October 17 and November 18, 2022, the hotline received more than 1,050 inquiries, with around 250 of those posing questions about ballots. The election vendor also set up its own hotline for ballot requests, and it set up and maintains an election tally website, *see* Ballot Information: Received Ballot Count, https://uawvote.com/. The election vendor hotline received 4,200 inquiries about ballot issues, and the website processed 3,900 requests for ballots, all of which were satisfied. In total, more than 3,850 requests for replacement ballots and 1,200 requests for new ballots were received, and all requested ballots were mailed.

The Monitor also has worked with the election vendor to investigate all reports of missing or duplicate ballots, along with isolated reports of ballots in some cases being sent to non-members. The election vendor also has implemented steps to ensure that no double counting will occur during tabulation. In one instance, a small number of non-members received ballots because information about them incorrectly was uploaded to LUIS by a local union, which included non-UAW members in its submission. In some instances, when the LUIS database was run against the U.S. Postal Service "TargetSmart" address correction clearinghouse database, it was found that members had a new or changed mailing address on file. That process resulted in more than 38,000

addresses being updated, and 25,000 addresses being discovered for members whose mailings previously were returned as undeliverable. Where new member addresses were found, ballots were mailed to both the old and new addresses, with special instructions explaining that only one ballot should be returned despite two forms being provided.

The Monitor also investigated reports that ballots were mailed to some members who are deceased, and in those cases family members were contacted to advise them to destroy the ballots, and notes were made by the election vendor to not count any such ballot returned. The Monitor also received a report that two members of a local union did not receive ballots while approximately 50 other members of the local unit did receive them. Upon investigation it was learned that some updates to the LUIS system after September 16, 2022 were not included in the global mailing list used by the election vendor for ballot distribution in October. New or replacement ballots immediately were mailed to 3,000 members whose records were determined to be affected by the data issue.

The Monitor and election vendor also investigated the reports of the four affiants and other persons identified in the complaint. Among the four affiants, all were mailed ballots in the original mailing wave in October 2022. Three affiants requested replacement ballots, which also were mailed. Due to statements by two affiants that ballots still were not received, replacement ballots were sent to them by express mail on November 18, 2022. Among the 27 other individuals identified in the complaint, 18 were sent ballots in the original mailing wave. Thirteen of the identified union members requested new or replacement ballots through the election hotline, and all of those were mailed. However, 14 individuals who were identified in the complaint — enumerated by the Monitor as Tom Bauer, Ebony Stewart, Becky Sutherland, Douglas Louthan, John Maser, Torin Perreyclear, Delores Goodson, Tina Hyland, Katheryn Quijada-Polanco, Cory

Plock, Nathan Marshall, William Decker, Craig Harvey, and Ed Baum — never submitted any request or inquiry for a new or replacement ballot. The Monitor's response is unclear on whether ballots ever were mailed to those persons.

The Monitor reports that to date more than 100,000 ballots have been returned, and he notes that the approximately 10% to-date return rate is consistent both with the overall 13% turnout in the 2021 member referendum, and with a recent direct election of officers conducted by the Teamsters union, which concluded with an overall 14% turnout.

## II.

Plaintiff Lehman requests a preliminary injunction in this case, which orders the defendants to take certain steps to conduct the ongoing election. A preliminary injunction is an extraordinary, discretionary, "equitable remedy," that "may only be awarded upon a clear showing that the [plaintiff] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted); *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

Courts consider and balance four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) substantial harm to others if the injunction is issued; and (4) the public interest served by the injunction. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) (quoting *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)). Although courts describe the preliminary injunction inquiry as a balancing test, *see Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), demonstration of a strong likelihood of success generally is a predominating factor, *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682,

689 (6th Cir. 2014) ("the likelihood of success on the merits often will be the determinative factor.").

The success-on-the-merits inquiry must be all-encompassing. "In addition to demonstrating a likelihood of success on the substantive claims, a plaintiff must also show a likelihood of success of establishing jurisdiction." *Memphis A. Philip Randolph Institute v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021). "If a plaintiff cannot show a likelihood of jurisdiction, then the court [should] deny the preliminary injunction." *Ibid.* It is this question of subject-matter jurisdiction, hotly contested by the parties, that the Court must turn to first.

A.

The plaintiff invokes the LMRDA as the basis for the relief he requests. The LMRDA incorporates two distinct remedial avenues for union members to present grievances about the conduct of union elections. First, Title I guarantees union members "equal rights . . . to nominate candidates, [and] to vote in elections or referendums of the labor organizations." 29 U.S.C. § 411(a)(1). If a union member believes that right to have been violated, he or she "may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 412. Second, Title IV addresses the timing and manner in which local, national and international union elections of officers are to be conducted. 29 U.S.C. § 481 *et seq.*; *see also Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 181 (1964) ("Title IV contains elaborate statutory safeguards for the election of union officers."); *Harrington v. Chao*, 280 F.3d 50, 53 (1st Cir. 2002) ("Title IV of the LMRDA . . . establishes minimum standards for the election of union officers." (citation omitted)). To enforce rights granted under Title IV, the union member must file a complaint with the Secretary of Labor (after completing certain procedural requirements). 29 U.S.C. § 482(a). That is the *only* enforcement route under that title; district

court litigation is not an option. 29 U.S.C. § 483 ("The remedy provided by this subchapter for challenging an election already conducted shall be exclusive."); *Local No. 82, Furniture & Piano Moving Drivers v. Crowley*, 467 U.S. 526, 540 (1984) (Title IV "'sets up an exclusive method for protecting Title IV rights,' and Congress 'decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV.'") (quoting *Calhoon v. Harvey*, 379 U.S. 134, 140 (1964)).

Federal courts have long recognized the "identifiable overlap" of union members' election rights and remedies in Title I and Title IV, and the differences in enforcement mechanisms. *Knisley v. Teamsters Local 654*, 844 F.2d 387, 390 (6th Cir. 1988). And it has been said that "[t]he statutory rights contained within Title I and Title IV can sometimes seem to overlap," and that "[i]n terms of the substance of the rights guaranteed, it is thus hardly surprising that the line between a Title I and a Title IV violation is muddy." *Conille v. Council 93, Am. Fed'n of State, Cnty. & Mun. Emps.*, 973 F.3d 1, 9 (1st Cir. 2020). The plaintiff understands this as well, which evidently is why he styled his complaint as asserting rights under Title I. If what he is seeking in fact is the enforcement or protection of a right guaranteed under Title IV, he agrees that this Court does not have subject matter jurisdiction to entertain his complaint.

In *Crowley*, the Supreme Court began the line-drawing that helps to identify which statute is invoked in fact, regardless of the label or the plaintiff's attempt at artful pleading. First, as to timing, the Court held that "the exclusivity provision included in § 403 of Title IV plainly bars Title I relief when an individual union member challenges the validity of an election that has already been completed." 467 U.S. at 541 (footnote omitted). The Court also held that Title IV precludes suits brought under Title I when the plaintiff seeks to challenge the validity of an *upcoming* election and asks for injunctive relief. *Crowley*, 467 U.S. at 551.

Second, as for substance, it has been suggested that "a right [is] guaranteed by Title I if it [is] specific to an individual member or group of members." *Conille*, 973 F.3d at 9 (citing *Molina v. Union De Trabajadores De Muelles Y Ramas Anexas, Loc. 1740, UTM-ILA*, 762 F.2d 166, 168 (1st Cir. 1985) ("The typical Title I claim involves an allegation of unequal treatment among union members.")). In addition, "the complaint must seek 'appropriate' relief under that Title." *Ibid.* (citing *Crowley*, 467 U.S. at 538 ("[W]hether a Title I suit may properly be maintained by individual union members . . . depends on the nature of the relief sought.")). "[A]ppropriate relief under Title I may be awarded while a [union] election is being conducted" if the "allege[d] violations . . . are easily remediable . . . without substantially delaying or invaliding an ongoing election." *Crowley*, 467 U.S. at 546. The Supreme Court explained:

> If the remedy sought is invalidation of the election already being conducted with court supervision of a new election, then union members must utilize the remedies provided by Title IV. For less intrusive remedies sought during an election, however, a district court retains authority to order appropriate relief under Title I.

*Id.* at 551. As an example of such "appropriate relief," the Court posited that "union members might claim that they did not receive election ballots distributed by the union because of their opposition to the incumbent officers running for reelection. Assuming that such union members prove a statutory violation under Title I, a court might appropriately order the union to forward ballots to the claimants before completion of the election." *Id.* at 546. Those actions were taken by the Union in this case.

Lehman insists that his claim invokes Title I because the remedy he seeks — enlargement of time for ballot submission and a more robust notice protocol including in person polling in workplaces and union halls — falls into the "less intrusive" category condoned by *Crowley*. He stumbles, however, because the harm he alleges is not specific to him or to a discrete group of union members. As the *Conille* court explained, the essential question is "whether the violation

asserted is personal to the individual union member plaintiff or is instead shared by all members who are entitled to representation by a particular body." 973 F.3d at 9. Lehman's complaint targets the procedure used by the Union to give notice of the election and to distribute ballots — activities that affect the membership as a whole and not a specific or insular group. Title IV, not Title I, explicitly regulates the timing and method for giving notice of an election of officers for an international union. Lehman does not allege, for example, that certain members or certain union locals have been denied ballots or kept in the dark about the election. Instead, he says that the Union leadership's chosen methods of giving notice and distributing ballots are flawed because the word has not gotten out to the entire membership, resulting in a low response to the direct elections. Those grievances certainly are serious and should cause concern that a less-than-fulsome response from the membership may portend election results that are not genuinely representative of the will of the voters. But the complaint that motivates that concern must be presented to the Secretary of Labor, as it is a challenge to rights fully embraced under Title IV.

In *Calhoon v. Harvey*, 379 U.S. 134 (1964), the Supreme Court voiced further concern that permitting suit under Title I to enforce rights explicitly governed by Title IV would upend the entire statutory scheme and nullify the exclusive remedy provision of Title IV. The command of Title I — the union members "Bill of Rights" — is that all union members have "equal rights and privileges . . . to nominate candidates, to vote in elections or referendums of the labor organization . . . and to participate in the deliberations and voting." 29 U.S.C. § 411. The Court read this language as stating "no more than . . . that members and classes of members shall not be discriminated against in their right to nominate and vote." *Id.* at 138-39. But when a complaint does not allege that "union members . . . have . . . been discriminated against in any way," or "have

been denied no privilege or right to vote or nominate which the union has granted to others," it does not invoke Title I. *Ibid.*

Dozens of decisions following that principle have held that to be cognizable under Title I, the plaintiff must allege not merely procedurally deficient handling of the election process, but *unequal* treatment of some members versus others. *See*, *e.g.*, *Members For a Better Union v. Bevona*, 152 F.3d 58, 65 (2d Cir. 1998) ("To be viable, a claim under § 101(a)(1) must therefore allege the denial of some privilege or right to vote which the union has granted to others.") (citing cases). As the Supreme Court explained in *Crowley*, Congress expressly provided disjunctive remedies in Title I and Title IV to foreclose exactly the sort of mid-stream election interference that the complaint in this case postulates, instead providing that the screening of such complaints in the first instance is delegated exclusively to the Secretary of Labor to determine when probable cause exists to pursue formal litigation. According to the *Crowley* Court, reversing a decision by the district court, which ordered relief similar to what the plaintiff seeks here, judicial supervision of union elections is exactly what Congress sought to *avoid*, not to *enable*, when enacting the LMRDA. *Crowley*, 467 U.S. at 551 ("This action by the District Court directly interfered with the Secretary's exclusive responsibilities for supervising new elections, and was inconsistent with the basic objectives of the LMRDA enforcement scheme.").

The plaintiff principally cites *Blanchard v. Johnson*, 532 F.2d 1074 (6th Cir. 1976), for the proposition that the right to of union members to engage in an "informed" and "meaningful" vote is one that is guaranteed by Title I. However, that case does not help him here because it adjudicated allegations that the union's executive board had submitted to its members a referendum on whether to affiliate with one of three international federations of unions, without informing members that two other federations had proposed competing offers for affiliation. *Id.*

at 1076. It did not deal with the elections of union officers or board members. Instead, the vote was for a member referendum. The procedure for member referendums is not explicitly governed by any provision of Title IV, and such ballots are instead referred to only generally and in passing in Title I. *See* 29 U.S.C. § 411(a)(1). In contrast, Title IV regulates in rather extensive detail the timing and procedures of elections for the *officers* of international unions. *See* 29 U.S.C. § 481(a) ("Every national or international labor organization . . . shall elect its officers not less than once every five years."); 29 U.S.C. § 481(e) ("*In any election required by this section* . . . . Not less than fifteen days prior to the election notice thereof shall be mailed to each member at this last known home address.") (emphasis added).

The plaintiff's claim is properly characterized as arising under Title IV of the LMRDA. As such, exclusive jurisdiction over it lies with the Department of Labor, and this Court does not have subject matter jurisdiction to entertain it.

B.

Even if the complaint could be read as invoking Title I of the LMDRA, the pleaded facts do not support the plaintiff's standing to bring it. Federal courts may adjudicate only "actual cases and controversies" involving plaintiffs who have suffered an injury. *Miller v. City of Wickliffe*, 852 F.3d 497, 502-03 (6th Cir. 2017) (citing U.S. Const. art. III, § 2, cl. 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The plaintiff must have standing to bring his claim, which means that he must demonstrate "actual present harm or a significant possibility of future harm." *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)).

Lehman lacks standing to pursue any claims against the Union predicated on alleged lack of notice of the election or failure to distribute ballots effectively, because he conspicuously does

not allege that he was unaware of the election, unable to obtain a ballot, or unable to vote. It is well settled that an individual may not obtain standing by merely asserting that the rights of others have been violated. *Davis v. Colerain Township*, 51 F.4th 164, 173 (6th Cir. 2022) ("[T]he usual third-party-standing rule [holds] that one party may not enforce the rights of others."). Violation of the rights even of a fellow union member is not sufficient to establish standing by a party who by himself has suffered no injury, because "'[s]tanding is not dispensed in gross.'" *Kentucky v. Yellen*, --- F.4th ---, No. 21-6108, 2022 WL 17076099, at *12 n.12 (6th Cir. Nov. 18, 2022) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)). *See ibid.* ("[T]o win summary judgment and obtain injunctive relief, Kentucky and Tennessee *each* had to demonstrate, with evidence, why it was suffering particularized continuing or imminent injuries in fact, and why that remained the case even after promulgation of the Rule." (emphasis added; citing *Lujan*, 504 U.S. at 561, 560 n.1 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way."))).

The complaint recites extensively alleged difficulties that named and unnamed union members *other than Lehman* had in obtaining or casting ballots, but nothing in the record suggests that Lehman himself personally suffered any impairment to his democratic rights during the ongoing election. "The LMRDA confers standing to 'bring a civil action in a district court' only on a 'person whose rights secured by the provisions of [the LMRDA] have been infringed by any violation' thereof. 29 U.S.C. § 412. The LMRDA consequently confers no standing to sue based on the rights of others." *United Bhd. of Carpenters v. O'Donnell*, 833 F. App'x 133, 134 (9th Cir. 2021).

Lehman has failed to plead any facts suggesting that *his* rights under the LMRDA have been violated.